Filed 10/7/25  In re J.O. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| In re J.O., a Person Coming Under the Juvenile Court Law. | C101505 |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>J.O.,<br><br>Defendant and Appellant. | (Super. Ct. No. JD20203) |

This appeal concerns a juvenile court transfer hearing under subdivision (a) of Welfare and Institutions Code section 707.[1]  In January 2020, when J.O. was 16 years old, he was involved in a drug-deal where an accomplice shot and killed the victim

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

during a robbery. A juvenile wardship petition (§ 602) was filed charging J.O. with murder (Pen. Code, § 187, subd. (a)), attempted murder (*id*., §§ 664/187, subd. (a)), and second degree robbery (*id*., §§ 211, 212.5, subd. (c)). The wardship petition also alleged a robbery-murder special circumstance. (*Id*., § 190.2, subd. (a)(17)(A).) In November 2020, the juvenile court granted the People's motion to transfer the matter to adult criminal court. Following a preliminary hearing and the passage of Assembly Bill No. 2361 (2021-2022 Reg. Sess.) (Assembly Bill No. 2361), which modified the evidentiary standard that applies at juvenile court transfer hearings, a second transfer hearing was held in 2024. Applying the new evidentiary standard, the juvenile court found that it was proper to transfer the matter to adult criminal court.

J.O. appeals, contending substantial evidence does not support the juvenile court's transfer order and that the court prejudicially erred by allowing an unqualified probation officer to testify as an expert witness on certain subjects. We disagree and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Factual Background*

We briefly summarize the relevant facts.[2] Additional information related to the claims raised on appeal is set forth as necessary in the Discussion, *post*.

At all relevant times, J.O. was on probation for committing a battery with serious bodily injury when he was 14 years old. (Pen. Code, § 243, subd. (d).) As a condition of his probation, J.O. was required to wear a Global Position System (GPS) ankle monitor, which tracked his location 24 hours a day. On December 31, 2019, when J.O. was 16 years old, he sent a friend request on Snapchat to Samantha Farris, a minor female he did

---

[2] Before the commencement of the second transfer hearing, the parties stipulated that the evidence submitted at the first transfer hearing could be deemed "received" at the second hearing. The juvenile court also granted the defense's request to take judicial notice of the transcript from the January 2022 preliminary hearing.

not know.  After they exchanged a few messages and photographs, J.O. indicated that he wanted to buy some marijuana.  Samantha agreed to sell J.O. two ounces of marijuana for $280, an amount she believed to be significantly more than the actual price for such a quantity of marijuana.  J.O. arranged for the transaction to occur at the "dead end" of Benton Place, a residential area of West Sacramento near a pedestrian trail/path.

Several days later, on January 4, 2020, J.O. and two other minors--M.A. (female) and M.F. (male)--went to a gas station in M.A.'s car around 7:00 p.m.  M.F., who was J.O.'s best friend, had a backpack.  Video recordings showed J.O. using his hand at the gas station to mimic the firing of a gun multiple times.

After the group left the gas station, J.O. told M.A. about the drug deal.  J.O. and M.F. talked about "ripping off" a female.  At around 7:20 p.m., J.O. and M.F. left M.A.'s car at a nearby high school and walked towards Benton Place.  It was dark and foggy.

Meanwhile, Samantha and two other minor females (S.S. and S.K.) drove to Benton Place to complete the drug deal.  When they arrived, J.O. approached Samantha, who was sitting in the front passenger seat of S.K.'s car.  After Samantha gave J.O. both ounces of marijuana, he handed her $15 and then ran toward the high school; Samantha and S.S. ran after him.

During the pursuit, S.S. saw J.O. and M.F. running together along the pedestrian trail.  Shortly thereafter, M.F. fired seven gunshots.  One of the bullets struck Samantha.  J.O. did not call for help, but instead ran away from the area with M.F.  Samantha died at the scene from a single gunshot wound to the lower back.

When J.O. and M.F. returned to M.A.'s car, M.F. was holding a gun and carrying his backpack.  M.A. drove M.F. to a friend's house.  When M.F. got out of the car, he took his backpack with him.

Less than two hours after the shooting, the police went to the residence where M.F. had been dropped off.  A search of the backpack with M.F.'s name on it revealed the weapon used in the shooting--a semiautomatic black "AR-15 style firearm pistol"

3

with a 30-round magazine. During the police investigation into the shooting, there was no evidence indicating that the victim or the other minor females were armed with a gun or other weapon. The data from J.O.'s ankle monitor revealed that he had been in the area near Benton Place at the time of the shooting and on two other occasions just days before the shooting. The data also indicated that J.O. cut his ankle bracelet off less than two hours after the shooting.

A search of J.O.'s and M.F.'s Snapchat accounts revealed content (images, video recordings, and messages) indicating that, around the time of the shooting, J.O. possessed and sold firearms, marijuana, and other substances, including pills. There was also content suggesting that J.O. had participated in other robberies.

*Procedural Background*

On November 8, 2016, the voters of California approved Proposition 57, the Public Safety and Rehabilitation Act of 2016 (Proposition 57). It went into effect the next day and applies to all juveniles charged directly in adult criminal court whose judgment was not final at the time it was enacted. (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 303-304.) As relevant here, Proposition 57 eliminated the People's ability to initiate criminal cases against juvenile offenders anywhere but in juvenile court. Instead, it requires the People to commence such actions in juvenile court. If the People wish to try a juvenile as an adult, the juvenile court must conduct a "transfer hearing" to determine whether the matter should remain in juvenile court or be transferred to adult criminal court. During the transfer hearing, the court considers factors such as the minor's maturity, degree of criminal sophistication, prior delinquent history, and whether the minor can be rehabilitated. Only if the juvenile court transfers the matter to adult criminal court can the juvenile be tried and sentenced as an adult. Proposition 57 also removed the presumption of unfitness to be tried as a juvenile that previously attached to the alleged commission of certain offenses. (See *People v. Padilla* (2022) 13 Cal.5th 152, 159-160, 166; *Lara,* at pp. 303, 305.)

4

In September 2017, when J.O. was 14 years old, he was arrested after he and two others physically attacked a minor and stole his cell phone. The victim suffered head injuries and lost consciousness. A few weeks later, J.O. admitted to committing a battery involving serious bodily injury (Pen. Code, § 243, subd. (d)), was declared a ward of the juvenile court, and placed on probation. Thereafter, J.O. participated in Multi-Systemic Therapy (MST) and family therapy, but was discharged from the MST program in May 2018 due to a violation of the conditions of his probation. As a result, J.O. was placed in the Juvenile Justice Diversion and Treatment Program [(JJDTP)] and "worked with a team of support persons" that included various services (e.g., family therapy, anger management, substance abuse treatment).

From September 2017 to December 2019, J.O. was incarcerated multiple times and "incurred 11 incident reports for non-compliant behaviors," including fighting with another inmate and "aggression towards staff."

In January 2020, after Samantha was killed, the instant juvenile wardship petition (§ 602) was filed charging J.O. with murder (Pen. Code, § 187, subd. (a)), attempted murder (*id.*, §§ 664/187, subd. (a)), and second degree robbery (*id.*, §§ 211, 212.5, subd. (c)). The wardship petition also alleged a robbery-murder special circumstance (*id.*, § 190.2, subd. (a)(17)) and firearm enhancements (*id.*, § 12022, subd. (a)(1)). On the day the wardship petition was filed, the People moved to transfer the matter from juvenile court to a court of criminal jurisdiction.

From January 2020 to August 2020, J.O. "incurred over 20 incident reports" while incarcerated in connection with this case, including reports for "defiance, failure to follow staff directives, manipulation of staff, threatening to assault staff, [and] assault on another minor."

In November 2020, after a hearing, the juvenile court issued an order transferring the matter to adult criminal court. The court found that all five of the relevant (statutory) criteria weighed in favor of transfer. At that time, section 707 only required the People

"to establish by a preponderance of the evidence that 'the minor should be transferred to a court of criminal jurisdiction.' " (*In re S.S.* (2023) 89 Cal.App.5th 1277, 1284 (*S.S.*) [describing prior law], superseded by statute on other grounds as stated in *In re J.M.* (2024) 103 Cal.App.5th 745; see former § 707, subd. (a)(3), as amended by Stats. 2018, ch. 1012, § 1.)

From November 2020 to January 2022, J.O. incurred numerous incident reports for various misconduct while incarcerated, including misuse of a computer/Internet for non-school purposes and defiant and disrespectful behavior toward staff. In January 2022, after a preliminary hearing, J.O. was held to answer the charges and enhancements alleged in the wardship petition. From January 2022 to November 2022, J.O. incurred various incident reports for misconduct, including using a computer for non-school purposes and failing to follow staff directives.

In November 2022, the defense filed a motion to remand the matter to the juvenile court to conduct a new transfer hearing in light of the change in law effected by Assembly Bill No. 2361. As discussed more fully *post*, Proposition 57 was amended several times after the juvenile court issued its first transfer order in 2020. (See, e.g., Stats. 2022, ch. 330, § 1, Assembly Bill No. 2361.) Of particular relevance here, Assembly Bill No. 2361 raised the People's burden of proof on a transfer motion and made clear that the analysis of the five criteria set forth in section 707 should be focused through the lens of the minor's "amenability to rehabilitation." Effective January 1, 2023, a minor cannot be transferred to adult court unless the juvenile court finds by *clear and convincing* evidence that the minor is *not amenable to rehabilitation* while under its jurisdiction. (Assembly Bill No. 2361; see § 707, subd. (a)(3), italics added.)[3]

_____

[3] As a decision from this court recently explained: "Under prior versions of [section 707], courts determined whether minors were 'fit and proper subject[s] to be dealt with under the juvenile court law' and considered 'rehabilitation' and 'amenability to care,

6

In February 2023, after the superior court denied the defense's request for an order remanding the matter to the juvenile court for a second transfer hearing, we issued an order granting such relief in response to a writ petition.

In July 2024, after a hearing that spanned multiple days, the juvenile court issued a detailed written order again transferring the matter to adult criminal court. The court found by clear and convincing evidence that J.O. was not amenable to rehabilitation while under its jurisdiction.

J.O. filed a timely notice of appeal. The matter was assigned to this panel in July 2025 and fully briefed in August 2025.

## DISCUSSION

### I

### *Transfer Order*

J.O. first argues reversal is required because substantial evidence does not support the juvenile court's transfer order, including the court's ultimate finding that he was not amenable to rehabilitation while under its jurisdiction. We disagree.

A. *Applicable Law and Standard of Review*

Section 707 sets forth the procedures for transferring an individual who committed a crime as a minor from juvenile court to a court of criminal jurisdiction (or adult criminal court). "It provides that whenever a minor aged 16 years or older is alleged to have committed a felony, the prosecutor may move 'to transfer the minor from juvenile

---

treatment, and training' as part of the analysis. [Citations.] After Proposition 57 removed the language regarding both fitness and amenability, some courts that had referred to section 707 hearings as 'fitness hearings' began referring to 'transfer hearings.' [Citations.] Now that section 707 makes 'amenab[ility] to rehabilitation' the ultimate determination, juvenile courts would be better served referring to 'amenability hearings.' " (*S.S.*, *supra*, 89 Cal.App.5th at p. 1288.) In this opinion, we refer to the relevant hearing as a juvenile court transfer hearing to be consistent with the record, although we agree that such hearings are more accurately characterized as "amenability hearings."

7

court to a court of criminal jurisdiction.' " (*In re Miguel R*. (2024) 100 Cal.App.5th 152, 164 (*Miguel R*.), citing § 707, subd. (a)(1).) The motion must be made prior to the attachment of jeopardy. After the motion is filed, the probation department prepares "a report on the behavioral patterns and social history of the minor." (§ 707, subd. (a)(1).)

"The Legislature amended section 707 in 2023 and 2024. Effective January 1, 2023, Assembly Bill [No.] 2361 amended section 707[, subdivision] (a)(3) by adding the following italicized language: 'Following submission and consideration of the report, and of any other relevant evidence that the petitioner or the minor may wish to submit, the juvenile court shall decide whether the minor should be transferred to a court of criminal jurisdiction. *In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.* In making its decision, the court shall consider the criteria specified in subparagraphs (A) to (E), inclusive. If the court orders a transfer of jurisdiction, the court shall recite the basis for its decision in an order entered upon the minutes, *which shall include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.*' " (*Miguel R., supra*, 100 Cal.App.5th at p. 164; see *S.S., supra*, 89 Cal.App.5th at p. 1294 [explaining that the "recite the basis for its decision" requirement means the juvenile court "should 'explicitly "articulate its evaluative process" by detailing "how it weighed the evidence" and by "identify[ing] the specific facts which persuaded the court" to reach its decision' whether to transfer minor to a court of criminal jurisdiction"]; *ibid*. [noting that the juvenile court's articulation of its evaluative process, like its analysis, "should focus on minor's amenability to rehabilitation"].)

Accordingly, Assembly Bill No. 2361 amended the procedure for transferring a case to adult criminal court in three ways: (1) it raised the People's burden of proof to clear and convincing evidence, (2) it made amenability to rehabilitation while under

8

jurisdiction of the juvenile court "the ultimate question for the court to decide," and (3) it required the juvenile court to state the reasons supporting a finding that the minor is not amenable to rehabilitation. (*In re E.P.* (2023) 89 Cal.App.5th 409, 416.)

The five statutory criteria listed in subparagraphs (A) through (E) of section 707, subdivision (a)(3) were not amended by Assembly Bill No. 2361. (See Stats. 2022, ch. 330, § 1.) Those criteria are: (1) "[t]he degree of criminal sophistication exhibited by the minor"; (2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction"; (3) "[t]he minor's previous delinquent history"; (4) "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor"; and (5) "[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor." (§ 707, subd. (a)(3)(A)-(E).) The statute sets forth a nonexhaustive list of relevant factors for the court to consider with respect to each of the five criteria. (§ 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).) These criteria "are based on the premise that the minor did, in fact, commit the offense." (*People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 682 (*Jones*); *Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 189 (*Kevin P.*).) The ultimate determination of whether "the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court" (§ 707, subd. (a)(3)) is not the same as the second criterion, which calls for consideration of "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (*id.*, subd. (a)(3)(B)(i)). (*Miguel R., supra*, 100 Cal.App.5th at p. 166.)

"Effective January 1, 2024, Senate Bill [No.] 545 [(2023-2024 Reg. Sess.)] amended section 707 to require that with respect to each of th[e] five criteria the juvenile court 'shall give weight to any relevant factor,' including the specific factors listed as relevant to each criterion. [Citation.] The previous version of the statute made consideration of those factors discretionary, not mandatory." (*Miguel R., supra*, 100 Cal.App.5th at pp. 164-165.) Senate Bill No. 545 further amended section 707 to specify additional factors that must be considered in determining whether the People have

9

carried their burden of proof to transfer a juvenile to adult criminal court. (See § 707, subd. (a)(3)(A).) Specifically, Senate Bill No. 545 amended the factors the court must weigh in evaluating a minor's criminal sophistication to include "the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery." (*Id.*, subd. (a)(3)(A)(ii).) It also amended the factors the court must weigh in evaluating the circumstances and gravity of the offense to include "evidence offered that indicates that the person against whom the minor is accused of committing an offense trafficked, sexually abused, or sexually battered the minor." (*Id.*, subd. (a)(3)(E)(iii).)

"We review the juvenile court's ruling on a transfer motion for abuse of discretion. [Citation.] 'The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.' [Citation.] The juvenile court's findings with respect to each of section 707's five criteria are findings of fact reviewed for substantial evidence. [Citation.] In conducting a substantial evidence review, we draw all reasonable inferences in support of the court's findings." (*Miguel R., supra*, 100 Cal.App.5th at p. 165.)

"Likewise, we review for substantial evidence the juvenile court's ultimate finding 'that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.' [Citation.] Because the juvenile court must make that finding by clear and convincing evidence, we 'determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by' the clear and convincing evidence standard." (*Miguel R., supra*, 100 Cal.App.5th at p. 165.)

10

" 'The standard of proof known as clear and convincing evidence demands a degree of certainty greater than that involved with the preponderance standard, but less than what is required by the standard of proof beyond a reasonable doubt.' [Citations.] ' "Clear and convincing" evidence requires a finding of high probability.' [Citations.] Courts have also described the standard 'as requiring that the evidence be " 'so clear as to leave no substantial doubt'; 'sufficiently strong to command the unhesitating assent of every reasonable mind.' " ' " (*S.S., supra*, 89 Cal.App.5th at p. 1286.)

B. *Analysis*

We are unpersuaded by J.O.'s contention that the juvenile court's transfer order is not supported by substantial evidence. As noted *ante*, in deciding whether transfer was proper, the court was required to evaluate the five criteria set forth in subdivision (a) of section 707. Applying these factors, the ultimate question was whether the People demonstrated, by clear and convincing evidence, that J.O. was "not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3); *Miguel R., supra*, 100 Cal.App.5th at p. 166.) The weight to be given each of the five criteria is within the juvenile court's discretion. (*D.C. v. Superior Court* (2021) 71 Cal.App.5th 441, 445 (*D.C.*); see *In re E.P., supra*, 89 Cal.App.5th at p. 417 [the court has the discretion to conclude that one or more of the five factors predominate so as to determine the result, even though some or all of the other factors might point to a different result].)

Next, we consider whether substantial evidence supports the findings in the juvenile court's transfer order, which was issued after the court heard testimony from a number of witnesses (e.g., mental health experts, probation officers, police officers) and considered various other materials submitted by the parties and the probation department

11

(e.g., juvenile court transfer hearing report, mental health expert reports).[4]  In making this determination, we accept all evidence that supports the successful party and draw all reasonable inferences to uphold the challenged order.  (*Harley-Davidson, Inc. v. Franchise Tax Bd.* (2015) 237 Cal.App.4th 193, 213.)  "It is not our role to reweigh the evidence, redetermine the credibility of the witnesses, or resolve conflicts in the testimony, and we will not disturb the judgment if there is evidence to support it."  (*Ibid*.)  In applying the substantial evidence standard, we do not review the evidence to determine if there is substantial evidence to support J.O.'s position, but only to see if substantial evidence exists to support the challenged order.  Thus, we *only* look at the evidence offered in the People's favor and determine if it was sufficient to support the juvenile court's findings as to each of the five statutory criteria.  (See *Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1245.)  If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal for insufficient evidence.  (*People v. Kraft* (2000) 23 Cal.4th 978, 1054.)  "As with all substantial evidence challenges, an appellant challenging [a finding of fact] for insufficient evidence must lay out the evidence favorable to the other side and show why it is lacking.  Failure to do so is fatal.  A reviewing court will not independently review the record to make up for appellant's failure to carry his burden."  (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1266 (*Defend the Bay*).)

---

[4]  As relevant here, Corey Johnson, Senior Deputy Probation Officer, testified as an expert witness for the People, as we discuss in more detail *post*.  Dr. Matthew Soulier, a board certified child and forensic psychiatrist, was retained by the defense to evaluate J.O. in connection with the transfer hearing and testified therein.  Dr. Rahn Minagawa, a clinical and forensic psychologist, was also retained by the defense and testified at the hearing as an expert in the field of adolescent psychology.

### 1. *Criminal Sophistication*

The first statutory criterion is "[t]he degree of criminal sophistication exhibited by the minor." (§ 707, subd. (a)(3)(A)(i).) When evaluating this criterion, "the juvenile court shall give weight to any relevant factor, including, but not limited to, the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense; the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior; the effect of familial, adult, or peer pressure on the minor's actions; the effect of the minor's family and community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery on the minor's criminal sophistication." (*Id.*, subd. (a)(3)(A)(ii).)

The juvenile court "consider[s] the whole picture, that is, all the evidence that might bear on the minor's criminal sophistication, including any criminal sophistication manifested in the present crime." (*Jones*, *supra*, 18 Cal.4th at pp. 683-684; *Kevin P., supra,* 57 Cal.App.5th at p. 192.) Criminal sophistication can be shown with facts demonstrating an ' "ability to appreciate the risks and consequences of [one's] criminal behavior' and [one's] awareness 'of the wrongfulness . . . of [one's] conduct.' " (*Kevin P.*, at p. 193.) Positive factors such as "normal cognitive functioning" or intelligence by itself "do not affirmatively demonstrate criminal sophistication." (*Ibid.*) But they can support finding this criterion "weighs in favor of transfer to the extent [the positive factors] fail to mitigate other evidence that does affirmatively demonstrate criminal sophistication." (*Ibid.*; see *In re J.S.* (2024) 105 Cal.App.5th 205, 214 (*J.S.*) [where the minor finished high school and took college courses in custody, there was "little to no indication of intellectual deficits"].)

In assessing the criminal sophistication criterion, the juvenile court found that several of the relevant factors were inapplicable or "neutral," including J.O.'s age and maturity. In this regard, the court explained as follows: "[J.O.'s] level of maturity

13

generally aligns with his chronological age, both at the time of the offense[s] [(16 years and 10 months old)] and now. [¶] While many of his behaviors can certainly be described as immature for his age, [J.O.] also has shown resourcefulness and a degree of sophistication and worldliness. For instance, while on supervision before the present offense, with advance planning he managed to sneak away to Los Angeles for a number of days. While incarcerated, he managed to procure marijuana during an offsite dental visit. Additionally, while incarcerated in connection with this case he has proven resourceful in using the computer for unauthorized purposes . . . . Overall, the Court finds that this subfactor is neutral, as [J.O.] has shown both immaturity and sophistication." (Fn. omitted.)

The juvenile court also found that the intellectual capacity factor was neutral, noting that J.O. was "at least of average intelligence," and that he had "achieved admirable academic success" while incarcerated, obtaining "multiple [Associate of Arts (AA)] degrees with a good grade point average [i.e., 3.5 or above]." Other neutral or inapplicable factors included J.O.'s involvement in the child welfare or foster care system (neutral) and J.O. as a victim of human trafficking, sexual abuse, or sexual battery (inapplicable or neutral). In making these determinations, the court explained that although there were approximately 12 child welfare referrals involving J.O.'s family between 2005 and 2019 "none were substantiated," and there was no evidence that J.O. was a victim of human trafficking, sexual abuse, or sexual battery.

The juvenile court cited two factors related to the criminal sophistication criterion that weighed against transfer, including J.O.'s physical, mental, and emotional health at the time of the alleged offenses. As for this factor, the court cited his diagnosis with ADHD at an early age, as well as various mood disorders, noting that "[o]ver the years, [J.O.] has received a variety of medications to treat his mental health and behavioral symptoms." The court concluded that "[o]verall, this subfactor weighs against transfer. While [J.O.'s] emotional state at the time of the offense (undisturbed if not enthusiastic)

14

weighs in favor of transfer, it is outweighed by his mental health diagnoses and trauma history." (Emphasis omitted.)

The juvenile court also found that the childhood trauma factor weighed against transfer, explaining that "[t]here is no doubt that [J.O.] suffered childhood trauma."

By contrast, the juvenile court found that four factors related to the criminal sophistication criterion weighed in favor of transfer, including J.O.'s conduct in connection with the charged offenses. In reaching its conclusion as to this factor, the court explained: "[J.O.'s] actions on and just before January 4, 2020 show a significant degree of sophistication. The crime was planned, including selecting and scouting a favorable location, coordinating with accomplices, positioning a get-away driver [(M.A.)] and accomplice [(M.F.)], ensuring the presence of a firearm to aid in completing the crime, and developing a ruse (payment of a premium price) to entice [Samantha] and her friends to engage in the transaction. [¶] On the other hand, there are aspects of [J.O.'s] actions that suggest a lack of sophistication, including the wearing of a tracking device (the GPS ankle monitor) to the crime, his failure to attempt to hide his face, and the fact that he used an email account with his name to arrange the transaction. [¶] . . . [¶] But the fact that [J.O.] committed the crime while wearing a GPS device shows two things: (i) his determination to commit the crime notwithstanding the unavoidable risk that resulted from the requirement that he wear a GPS monitor (which supports transfer), and (ii) some lack of sophistication (which weighs against transfer), as a more sophisticated person would wait until he was off GPS before committing the crime. [¶] However, overall, the Court finds that [J.O.] displayed a relatively high degree of criminal sophistication, for his age, with respect to his actions on January 4, 2020. This subfactor weighs in favor of transfer." (Emphasis omitted.)

The juvenile court also found that J.O.'s impetuosity and appreciation of risks and consequences, the effect of familial, adult, or peer pressure, and the effect of J.O.'s family and community involvement all weighed in favor of transfer. As for the first of

15

these factors, the court found that J.O.'s "actions on January 4, 2020 were not the result of impetuousness or unconsidered reactivity. Instead they resulted from deliberation, planning (if imperfect), calculation, and design. [¶] So while [J.O.] acts impetuously, he is also a person who plans, considers, weighs costs and benefits, and then executes. [¶] This subfactor weighs strongly in favor of transfer, since [J.O.'s] actions on January 4th were not impetuous but planned and deliberate." (Emphasis & fn. omitted.)

In finding that the factor concerning the effect of familial, adult, or peer pressure weighed in favor of transfer, the juvenile court explained: "There is no evidence that anyone pressured [J.O.] to take part in the alleged robbery of January 4, 2020. While [M.F.'s] and [M.A's] participation undoubtedly reinforced [J.O.'s] own resolve to commit the act, there is substantial evidence that [J.O.] has leadership skills, and it is reasonable to assume that he was at least an equally-willing co-participant in the planning and execution of the robbery." (Fn. omitted.) In connection with this finding, the court noted that J.O.'s mother and father believed that he was not a "follower" but rather "the ringleader."

Finally, as for the factor concerning the effect of J.O.'s family and community involvement, the juvenile court stated: "Throughout his life, [J.O.] has received significant support from his family and community. He reported to Dr. Soulier that 'I was raised better than this. My family taught me better.' He has also received significant outside support and direction from therapists and educators, and since his contact with the juvenile justice system, from probation officers, legal counsel, juvenile court judges and social workers. He was not ignored -- to the contrary, throughout his life significant resources were deployed (imperfectly at times) to help [J.O.]. [¶] On the other hand, [J.O.] did suffer significant family trauma, including the after-effects of a difficult divorce, a challenging family situation, and what Dr. Soulier labeled 'deficient parenting.' [¶] Balancing these considerations, the Court finds that this subfactor slightly favors transfer." (Emphasis omitted.)

At the conclusion of its evaluation of the criminal sophistication criterion, the juvenile court stated: "Considering all the subfactors relating to sophistication, . . . the court finds that this factor weighs in favor of transfer. The sophistication shown on January 4, 2020 is entitled to heavy weight, as it most directly relates to the potential for serious criminality in the future." (Emphasis omitted.)

We reject J.O.'s contention that substantial evidence does not support the juvenile court's finding. J.O. simply cites a handful of cases for the proposition that minors, as a general matter, are less mature and responsible than adults, and then highlights certain evidence in support of his position and based thereon makes arguments more appropriately directed to a trier of fact. For example, J.O. asserts that the manner in which the charged offenses were committed showed a lack of criminal sophistication on his part because he set up the drug deal using his real name, exchanged photographs with the victim, wore an ankle monitor at the time of the incident, made no effort to disguise himself during the incident, and made a video about stealing marijuana "[d]irectly" after the incident. But in a substantial evidence challenge, an appellant cannot carry his burden on appeal by merely rearguing the "facts" and/or reasserting his position at trial. Instead, the appellant must lay out the evidence favorable to the other side and show why it is lacking. J.O.'s failure to do so here is fatal to his claim.[5] (*Defend the Bay, supra*, 119 Cal.App.4th at p. 1266.) It is not our role to independently review the record to make up for J.O.'s failure to carry his burden. (*Ibid.*)

In any event, we have reviewed the record and find that it includes sufficient evidence supporting the juvenile court's finding as to the criminal sophistication criterion. Among other things, there was evidence showing that J.O. was in the average

---

[5] J.O. acknowledges that there was "some planning involved" with respect to the charged offenses, but claims, without further elaboration, that "his behavior was not so sophisticated as to impede or preclude his rehabilitation."

range for cognitive functioning and was of "at least" average intelligence, had no physical health issues or significant maturity issues other than being a typical 16 year-old, and did not act impulsively in connection with the charged offenses. Further, there was evidence that J.O.'s actions were deliberate and calculated, and that he had a leadership role in the execution of the robbery. Indeed, a reasonable factfinder could have concluded that J.O. was a willing participant in a plan he designed (or helped to design) to "rip off" Samantha (i.e., obtain marijuana without paying the agreed-upon price), which included selecting the location of the drug deal and ensuring the presence of an escape route, getaway driver, and an armed accomplice to carry out the plan. Under the circumstances presented, ample evidence supports the trial court's findings with respect to the criminal sophistication criterion.

### 2. *Rehabilitation Prior to Expiration of Juvenile Court's Jurisdiction*

The second statutory criterion is "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction." (§ 707, subd. (a)(3)(B)(i).) In evaluating this criterion, the court must consider "the minor's potential to grow and mature." (*Id.*, subd. (a)(3)(B)(ii).) The focus "is whether there is enough time to rehabilitate the minor while the minor is still eligible to remain under juvenile court jurisdiction." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 166.)

On appeal, J.O. does *not* raise a substantial evidence challenge to the juvenile court's findings with respect to this criterion. He does not argue or suggest that the juvenile court abused its discretion by finding that this criterion weighed against transfer to a court of criminal jurisdiction. We therefore discuss the court's observations and findings only briefly, and to the extent that they may relate to later claims.

During its analysis, the juvenile court noted that Dr. Minagawa had "testified that [J.O.] could be rehabilitated within the time remaining in juvenile court jurisdiction. The People did not offer any expert evidence from an adolescent psychologist rebutting this evidence. While [Johnson] is a well-qualified, experienced probation officer and has

18

expert knowledge about the programs and activities at the JDF, he does not have the ability to offer the sort of psychological evaluation offered by Dr. Minagawa. Dr. Minagawa's psychological testimony stands unrebutted."

The juvenile court then found the testimony's weight was reduced by the fact that although Minagawa "focuse[d] on the causal connection between [J.O.'s] history of trauma and his criminality," the court found "additional motivation for his actions, namely thrill-seeking and a desire for gain." The court went on to describe the transactional nature of the most successful interventions with J.O., both before the murder and later while J.O. was in custody, and found "most important of all" that J.O.'s involvement in the drug trade "was at least partially motivated by a rational if misdirected desire to enrich himself." Thus, "while his trauma history may have turned [J.O.] in an anti-social and troubled direction, his own rational-if-misguided choices propelled him to embrace a criminal lifestyle."

The court then noted that Minagawa had testified it would take approximately two to four years to rehabilitate J.O., which "bumps into the outer edge of juvenile court jurisdiction." Minagawa had also "accepted as true the claims of severe and sustained physical abuse," but the court found those claims unsupported by the evidence, concluding that "[w]hile weakened by these considerations, Dr. Minagawa's testimony remains unrebutted, and thus this factor weighs slightly against transfer." (Emphasis omitted.)

"Considering the subfactors relating to potential for rehabilitation before expiration of juvenile court jurisdiction, . . . the court finds that this factor weighs against transfer." (Emphasis omitted.)

Because this finding is unchallenged, no further discussion of this criterion is necessary. However, we note that the juvenile court was not required to credit the opinions proffered by the defense expert (Dr. Minagawa) or otherwise weigh evidence regarding the rehabilitation criterion in the way J.O. preferred. (See *In re Alejandro G.*

19

(2012) 205 Cal.App.4th 472, at p. 480 [the fact that the court's finding conflicted with two experts' opinions did not show a lack of substantial evidence because the court is not obligated to adopt the experts' opinions].)

### 3. *Previous Delinquent History*

The third statutory criterion directs the juvenile court to consider the "minor's previous delinquent history" and, when doing so, to "give weight to any relevant factor, including, but not limited to, the seriousness of the minor's previous delinquent history and the effect of the minor's family and community environment and childhood trauma on the minor's previous delinquent behavior." (§ 707, subd. (a)(3)(C)(i)-(ii).) Juvenile courts enjoy "broad discretion to consider all evidence relevant to this inherently case-by-case determination," including all forms of delinquent behavior. (*D.C., supra*, 71 Cal.App.5th at p. 455; see *id*. at p. 456 [the juvenile court considered the minor's "behavior documented in his school records"]; *J.S., supra*, 105 Cal.App.5th at pp. 214-215 [the juvenile court considered the minor's " 'significant school delinquency' history starting in the seventh grade, including poor behavior, suspensions, and multiple attempts by school officials to rehabilitate [the minor]"].)

In evaluating this criterion, the juvenile court began its analysis by discussing the seriousness of J.O.'s previous delinquent history, stating: "[J.O.'s] behavioral problems began at an early age, including being expelled from pre-school for disruptive behavior. By middle school he had dozens if not hundreds of behavioral incidents.

"[J.O.'s] involvement with legal system began when he was 14 years old with an assault that resulted in a concussion for the victim. While under supervision, his track record was quite poor -- he had numerous violations of GPS and other terms. There is strong evidence that January 4, 2020 was not his first rip-off or 'lick.' Instead, the evidence indicates that [J.O.] was fully immersed in a criminal lifestyle, involving involvement with stolen marijuana and firearms.

20

"Also, [J.O.] has had a serious substance use problem: He reported first using marijuana in 5th grade, and was a daily user by age 12, and had used other drugs . . . . He completed a substance abuse program from River Oak in 2019, but continued to use until his incarceration. In January 2019, he told [a counselor] that he planned to start using again when off probation. And while incarcerated he once managed to smuggle marijuana into the JDF. . . . It does not appear that [J.O.] has overcome his substance abuse problem; abstaining from use in the controlled environment of the JDF is much different than abstaining outside of a locked facility. [¶] The Court finds that his previous delinquency history was sustained, wide-ranging, and escalating. This subfactor weighs in favor of transfer." (Emphasis omitted.)

After finding that the factor of childhood trauma weighed against transfer, the juvenile court concluded that, on balance, the previous delinquent history criterion weighed moderately in favor of transfer.

On appeal, J.O. argues the juvenile court erred because "there is nothing in his delinquency history that would make him unamenable to the services available in juvenile hall." He acknowledges that he violated his probation "several times," but notes that he only had "one prior sustained petition" for assaulting "another juvenile" with two other minors and taking the victim's cell phone. J.O. also notes that he endured "traumatic events" during his childhood (e.g., intense conflict between his parents during their divorce, physical abuse by his mother and father), and that his "clinicians all testified to his openness and commitment to treatment (e.g., therapy)." As we have explained, in a substantial evidence challenge, an appellant cannot carry his burden on appeal by merely rearguing the evidence and/or reasserting his position at trial. Instead, the appellant must lay out the evidence favorable to the other side and show why it is

21

lacking.  J.O.'s failure to do so here is fatal to his claim.[6]  (*Defend the Bay, supra*, 119 Cal.App.4th at p. 1266.)

In any event, there is ample evidence in the record supporting the juvenile court's determination that the previous delinquent history criterion weighs in favor of transfer. J.O. ignores the evidence in the record showing his extensive delinquent history, which encompasses a person's criminal or antisocial behavior that occurred before they reached the age of majority (i.e., 18 years old).  (See *D.C., supra*, 71 Cal.App.5th at pp. 445-446, 450-451, 453, 455-456 [delinquent history may include conduct that occurred after the offense related to the transfer hearing, as well as conduct in school records even if that conduct did not result in a delinquency petition].)  In addition to the numerous (more than 200) instances of serious misconduct at school (e.g., possession of a knife, hitting another student) and the violent offense giving rise to the sustained wardship petition when he was 14 years old--battery with serious bodily injury (Pen. Code, § 243, subd. (d))--there was evidence indicating that J.O. was involved in other delinquent behavior, including drug sales, firearm sales, and robberies.  And, following his arrest in this matter, J.O. received numerous disciplinary reports while in custody for a variety of improper conduct (e.g., fighting, disruptive behavior, defiance).  In short, substantial evidence supports the juvenile court's findings as to the previous delinquent history criterion.

### 4. *Previous Attempts at Rehabilitation*

The fourth criterion requires the juvenile court to consider whether the "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor" weighed in favor of transfer.  (§ 707, subd. (a)(3)(D)(i).)  When evaluating this criterion, the juvenile court

---

[6]  J.O. acknowledges that there was "some planning involved" with respect to the charged offenses, but claims, without further elaboration, that "his behavior was not so sophisticated as to impede or preclude his rehabilitation."

must "give weight to any relevant factor, including, but not limited to, the adequacy of the services previously provided to address the minor's needs." (*Id.*, subd. (a)(3)(D)(ii).)

In assessing this criterion, the juvenile court stated: "The efforts to rehabilitate [J.O.] were long-running, multi-disciplinary, sustained, and, on occasion, intensive. The quantity of services that [J.O.] received is quite impressive. For instance, in third grade, he was referred to the UC Davis CAARE Diagnostic and Treatment Center to address his behavioral problems at school. By fourth grade, a section 504 Accommodation Plan was put in place, and by the end of that academic year he was found to have made 'tremendous progress' in his treatment. With further support it was reported by 6th Grade that [J.O.] had 'done well' in regulating his behaviors.

"[J.O.] was provided with mentors through the River Oak Treatment Center. He received intensive and extensive services from the JJDTP. According to Dr. Soulier, '[J.O.] agreed that he was often held accountable for his actions and offered multiple services by probation.'

"During this hearing, [J.O.] has argued that the services he received, while bountiful, were flawed, and were often undermined by other actions. For instance, [J.O.'s] mother stopped bringing him to PCIT (Parent-Child Interaction) therapy in 2007, and she disengaged from the UC Davis CAARE program in 2012.

"Staff turnover has also been identified as a contributing factor to the failure of previous efforts at rehabilitation. In particular, [J.O.] cites the departure of therapist Mirah James in 2019, with whom he had developed a positive and strong relationship.

"But of course there is no guarantee of continuity in therapists going forward either—to the extent his rehabilitation relies on the confluence of optimal therapeutic conditions it is fragile indeed, as such conditions rarely occur in a world where people change jobs, communications are missed, and not every performer meets high standards.

23

"Dr. Minagawa opined that the services were inadequate because they were not tailored to address his extensive trauma history. However, as noted above, the Court parts company with Dr. Minagawa when he accepts at face value the reports of sustained and regular physical abuse.

"[J.O.'s] ADHD was well known and has been addressed by professionals for most of his life. Dr. Soulier noted a marked change in behavior when taking medication, but [J.O.] has stopped taking ADHD medication.

"One particularly important fact about the previous rehabilitative efforts is how frequently they were reported to be successful in changing his behavior. Over and over again, [J.O.] reported insight and a resolve to do better, and the professionals treating him found progress, but backsliding and even escalation ensued. The events of January 4, 2020 belie the claim of earlier progress.

"Particularly in the few years before the present offense, [J.O.] received intense supervision and intervention, and yet he nonetheless took part in a robbery that led to the killing of [Samantha]. Indeed, he was in court the day before the robbery, supported by the probation office, and agreeing to comply with the terms of GPS. This factor weighs very strongly in favor of transfer, as years of treatment, support, and supervision failed to rehabilitate [J.O.]."

On appeal, J.O. does *not* specifically argue there was evidence showing that the previous attempts to rehabilitate him were successful. Instead, he claims the attempts at rehabilitation "were inadequate to meet his needs" and that he did not receive the "right type of therapy," as his treating therapists were not informed "about his exposure to trauma and abuse," which "led to anger, defiance, disrespect and problems with authority figures." J.O. adds that "a lack of consequences" was partly responsible for his poor behavior, and that, according to Dr. Minagawa, the probation department was " 'sort of complicit in not holding him accountable.' " Finally, J.O. notes, without citation to the record, that he has "benefitted from childhood-focused cognitive behavior," and that he

24

has "received structure and consistent consequences" over the preceding four years in custody, which has led to positive change.

Substantial evidence supports the juvenile court's finding that this criterion weighed in favor of transfer to a court of criminal jurisdiction. The record reflects that J.O. engaged in a continuous pattern of delinquent behavior from a young age until the commission of the current offenses, which was escalating in seriousness. As a result of his delinquent behavior, J.O. received various professional services to address his needs over the course of many years. The record discloses that, despite those extensive services and the supervision of the probation department, J.O. continued to engage in delinquent behavior and violated the terms of his probation multiple times, including the condition related to his ankle monitor. And J.O.'s poor behavior continued after he was incarcerated for the current offenses.

On this record, a reasonable factfinder could have concluded that, despite J.O.'s intellectual capacity, receipt of extensive mental health and other professional services, and placement on probation, he had no willingness or ability to improve his behavior based on his continued misconduct and cessation of medication. The juvenile court was not required to accept Dr. Minagawa's opinion that the services J.O. received were inadequate because they were not tailored to address his history of trauma. The court did not abuse its discretion in disagreeing with the defense expert's opinion and instead relying on the other evidence before it. (See *J.S., supra*, 105 Cal.App.5th at p. 212 [trial court is not bound by an expert's testimony and opinion]; *In re Alejandro G., supra*, 205 Cal.App.4th at p. 480 [court not obligated to adopt experts' opinions].)

### 5. *Circumstances and Gravity of Alleged Offenses*

The fifth and final criterion, the circumstances and gravity of the offense (§ 707, subd. (a)(3)(E)(i)), "focuses on the offense ' "alleged in the petition" ' [citation], and like the other statutory criteria, it is 'based on the premise that the minor did, in fact, commit the offense.' [Citation.] But the allegation that a minor committed a serious offense,

25

including murder, does not 'automatically require a finding of unfitness.' " (*Kevin P., supra,* 57 Cal.App.5th at p. 189, italics omitted.) When evaluating this criterion, the juvenile court must give weight to any relevant factor, including evidence that, while not justifying or excusing the crime, tends to lessen its magnitude, including, but not limited to, "the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the level of harm actually caused by the person, and the person's mental and emotional development. (§ 707, subd. (a)(3)(E)(ii); *Kevin P.,* at p. 189.)

In assessing this criterion, the juvenile court found that J.O.'s actual behavior, mental state, and degree of involvement weighed in favor of transfer, and that the level of harm weighed strongly in favor of transfer. By contrast, the court found that J.O.'s mental and emotional development weighed against transfer, as explained in the court's assessment of the criminal sophistication criterion. As for J.O.'s actual behavior, the court stated: "The shooter was [M.F.] not [J.O.]. However, [J.O.] was the person who communicated with [Samantha] about the marijuana transaction, and [J.O.] was the person who met with her. [J.O.] was undoubtedly a major participant. It is unknown who, if anyone, was the 'leader' of the crime, but there is evidence of [J.O's] leadership qualities." As for J.O.'s degree of involvement, the court said: "[J.O.] was a major participant in the crime, but it is unknown if he was the leader, or indeed if there was a leader and two followers, or three equally-willing co-participants. . . . [H]e arranged the meeting and shorted her for the marijuana, which caused her to chase him. He then ran towards [M.F.], whom he knew was armed, and who fatally shot her." As for the level of harm, the court stated: "It is not possible to overstate the harm caused by the killing of Samantha Farris. Her family's grief is deep and lasting, as shown by their moving testimony, and they kept vigil for her at every single court hearing in this matter. She was a young person with promise and vitality whose life was taken for some small amount of money."

26

On appeal, J.O. acknowledges that murder is a "particularly" serious offense, but suggests insufficient evidence supports the juvenile court's finding because he was not the shooter and never displayed a weapon or threatened anyone. J.O. adds, without citation to the record, that he has changed dramatically from "an irresponsible teenager to a thoughtful young man," insisting that he is no longer a danger to society due to "growth, maturity, education and therapy."

We are not persuaded that the juvenile court erred. The record reflects that the juvenile court considered the relevant factors, and substantial evidence supports the court's determination that the circumstances and gravity of the offenses weighed in favor of transfer to a court of criminal jurisdiction.

6. *Amenability to Treatment as a Juvenile*

As noted *ante*, a recent amendment to section 707 requires the juvenile court to make an "ultimate" finding that the minor "is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3); see *Miguel R., supra*, 100 Cal.App.5th at pp. 164, 167.) The court must consider all five enumerated criteria and state its reasons for finding the minor to be unamenable to rehabilitation while under the jurisdiction of the juvenile court. (§ 707, subd. (a)(3).)

At the conclusion of its written transfer order, the juvenile court stated: "Considering all the factors in their totality, through the lens of amenability to rehabilitation in the juvenile court system, the Court finds clear and convincing evidence in favor of transfer.

"The Court finds that the most dominant factor is the failure of previous attempts at rehabilitation. [J.O.] was receiving intensive supervision at the time of this offense. While he has made progress in the structured environment of the JDF, it will be more challenging for him to avoid the commission of crime when released, when the temptation to resume his participation in lucrative but illegal and dangerous drug activities will be strong.

27

"The Court is *not* finding that [J.O.] is irreparably delinquent. No such showing is required for transfer, and [J.O.] has shown real progress, both in his academic endeavors, and in his improving conduct at the JDF.

"However, the starting point for that progress is a location far from rehabilitation. On January 4, 2020, [J.O.] was a minor who was resistant to rehabilitation through the provision of services, who was immersed in a criminal lifestyle, and who displayed enthusiasm and some sophistication in reaping the gains associated with the dangerous enterprise of robbing people who were selling marijuana. His behavioral patterns were deep-rooted, persistent, apparently immune from rehabilitative efforts, and escalating.

"Thus, considering all the factors, the Court finds clear and convincing evidence that [J.O.] 'is not amenable to rehabilitation while under the jurisdiction of the juvenile court.' " (Emphasis omitted.)

Here, because substantial evidence supports the juvenile court's findings as to each of the four challenged statutory criterion, there is no basis to reverse the court's ultimate finding that the People satisfied their burden of proof by clear and convincing evidence that J.O was not amenable to rehabilitation while under the jurisdiction of the juvenile courts. Accordingly, we will affirm the transfer order.

II

*Expert Testimony*

Senior Deputy Probation Office Corey Johnson prepared a transfer report that recommended that J. O. be found unamenable to the care, treatment and training programs available through the juvenile court and later testified as an expert for the People in the areas of juvenile justice, criminogenic needs, and programming and rehabilitation. J.O. argues the juvenile court erred by finding that Johnson was qualified as an expert and that the error was prejudicial because Johnson "opined on amenability factors about which he had not background to address."

28

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates.  Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert."  (Evid. Code, § 720, subd. (a).)  " 'We are required to uphold the trial judge's ruling on the question of an expert's qualifications absent an abuse of discretion.  [Citation.]  Such abuse of discretion will be found only where " 'the evidence shows that a witness *clearly lacks* qualification as an expert.' " ' "  (*People v. Wallace* (2008) 44 Cal.4th 1032, 1062-1063.)

We need not decide whether the trial court abused its discretion in finding that Johnson was qualified as an expert because J.O. has failed to show prejudice.  " '[T]he erroneous admission of expert testimony only warrants reversal if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' "  (*People v. Pearson* (2013) 56 Cal.4th 393, 446.)  On appeal, J.O. makes no effort to show how he was prejudiced by Johnson's testimony, including testimony within the specific subjects on which the court found him qualified to testify as an expert.  Instead, without further elaboration, J.O. simply states that the testimony was prejudicial because Johnson "opined on amenability factors about which he had no background to address."

"[I]t is a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment."  (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609.)  An appellant must "supply the reviewing court with some cogent argument supported by legal analysis and citation to the record."  (*WFG National Title Ins. Co. v. Wells Fargo Bank, N.A.* (2020) 51 Cal.App.5th 881, 894.)  It is not the role of a reviewing court to "act as counsel for a party to construct a proper and persuasive

argument." (*Conservatorship of Tedesco* (2023) 91 Cal.App.5th 285, 302, fn. 20; see *Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52 ["[w]e are not required to examine undeveloped claims or to supply arguments for the litigants"].))

Pursuant to these principles, J.O. has forfeited his claim of prejudicial evidentiary error. We disregard conclusory arguments that are not supported by pertinent legal authority and fail to disclose the reasoning by which the party reached the conclusions he wants us to adopt. (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 287; see also *Allen v. City of Sacramento*, supra, 234 Cal.App.4th at p. 52 ["[w]hen legal argument with citation to authority is not furnished on a particular point, we may treat the point as forfeited and pass it without consideration"].)

## DISPOSITION

The juvenile court's order transferring this matter to a court of criminal jurisdiction is affirmed.

_____/s/_____
Duarte, J.

We concur:

_____/s/_____
Earl, P. J.

_____/s/_____
Mauro, J.